# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THEOPHILUS AND STEPHANIE AFOGHO, as parents and next friends of A.A., a minor, TODD PORTER, individually and as parent and next friend of C.P., a minor, MARCUS GREGORY, and CHRISTOPHER BOYKIN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 3:18-cv-00098-NJR-DGW |
| ILLINOIS CENTRAL SCHOOL DISTRICT 104 BOARD OF EDUCATION, ANDREA HEURING, EMILY WEBER, DEREK MORGAN, and SARAH SVOBODA, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, Theophilus and Stephanie Afogho, as parents and next friends of A.A., a minor, Todd Porter, individually and as parent and next friend of C.P., a minor, Marcus Gregory, and Christopher Boykin, and for their Complaint against the Defendants, Illinois Central School District 104 Board of Education, Andrea Heuring, Emily Weber, Derek Morgan and Sarah Svoboda, submit the following:

## NATURE OF ACTION

This is an action to correct unlawful racial discrimination and retaliation by the board of education of an Illinois public school district, as well as by the district's board president and certain of its teachers.

Illinois Central School District 104 is located in O'Fallon, Illinois, and consists of two schools:  Central Elementary School ("CES") and Joseph Arthur Middle School ("JAMS").

Plaintiffs include two mixed-race minors, A.A., and C.P., who were students attending JAMS in the relevant time period.

A.A. and C.P. were also members of the JAMS Student Council.  On January 18, 2017, while attending a scheduled student council meeting, Defendant Andrea Heuring, a teacher and Student Council Advisor, repeatedly referred to A.A. and C.P. as her "*slaves*" in front of other students and forced them to perform personal tasks for her.  When A.A., C.P., and their respective parents, Theophilus and Stephanie Afogho and Todd and Krista Porter, complained to the Board of Education about Defendant Heuring's actions, they and others with whom they associated with were subjected to repeated and pervasive discrimination and retaliation for making the complaints.  Such retaliation included, without limitation, the termination of C.P.'s African American father, Todd Porter, as the JAMS Head Boys Basketball Coach, despite having just taken the team to the state championship tournament for the first time in JAMS's history, and the demotion and removal of C.P.'s mother, Krista Porter, who was employed in the JAMS school cafeteria by a vendor.  Retaliation also occurred in the form of terminating the two African American assistant basketball coaches, Marcus Gregory and Christopher Boykin, who supported C.P., A.A. and their parents and voiced their complaints and opposition to the racial discrimination and retaliation.

Illinois Central School District 104 has a long history of racial intolerance and discrimination.  Despite the fact that both of its schools are located in a community with a significant African American population, and despite the fact that a significant percentage of its student population is African American, Illinois Central School District 104 failed to hire or employ a single African American teacher at either of its two schools at any time relevant herein.

Plaintiffs have filed related Charges of Discrimination under Title VII and the Illinois Human Rights Act.  The Charges of Plaintiffs A.A. and C.P. have at this time been administratively exhausted, and this First Amended Complaint incorporates new counts based upon those charges.  The Charges of the remaining Plaintiffs are still pending before the Illinois Department of Human Rights ("IDHR").  Plaintiffs anticipate amending the instant Complaint to add counts based on those Charges at a future date, once Plaintiffs' administrative remedies for the remaining Charges have been properly exhausted.[1]

## PARTIES

1.      Plaintiff A. A. is a minor of mixed race who is a citizen and resident of St. Clair County, Illinois.

2.      Plaintiffs Theophilus and Stephanie Afogho ("Theo" and "Stephanie") are citizens and residents of St. Clair County, Illinois, and are the parents of A.A., a minor.  Theo is an African American male and Stephanie is a white female.

3.      Plaintiff C.P. is a minor of mixed race who is a citizen and resident of St. Clair County, Illinois.

4.      Plaintiff Todd Porter ("Todd") is a citizens and residents of St. Clair County, Illinois.  Todd and his wife, Krista Porter ("Krista") are the parents of C.P., a minor.  Todd is an African American male and Krista is a white female.

5.      Plaintiff Marcus Gregory ("Gregory") is a citizen and resident of St. Clair County, Illinois.  Gregory is an African American male.

6.      Plaintiff Christopher Boykin ("Boykin") is a citizen and resident of St. Clair County, Illinois.  Boykin is an African American male.

---

[1] Plaintiffs are filing the instant First Amended Complaint before their administrative remedies are exhausted with respect to the adult Plaintiffs' Title VII and Illinois Human Rights Act ("IHRA") claims in order to timely file and preserve the minor Plaintiffs' claims under the IHRA.

7.      Illinois Central School District 104 is, and at all times relevant herein was, a body politic and a school district organized and operating under the laws of the State of Illinois, located in St. Clair County.

8.      The Board of Education of Illinois Central School District 104 ("the Board") is charged with, and responsible for, the operation of public schools within the district, and at all times relevant to this Complaint, was acting in that capacity under the color of state law.

9.      The Board governs two schools: Central Elementary School ("CES") and Joseph Arthur Middle School ("JAMS"), both physically located in O'Fallon, Illinois.

10.     Illinois Central School District 104 is, and at all times relevant herein was, a program or activity receiving federal financial assistance within the meaning of Title VI, 42 U.S.C. § 2000d.

11.     Illinois Central School District 104 is, and at all times relevant herein was, a unit of State, county, or local government in Illinois within the meaning of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

12.     Defendant Andrea Heuring ("Heuring") is a citizen and resident of St. Clair County, Illinois.  At all times relevant herein, Heuring was employed as a teacher for Illinois Central School District 104 until approximately May of 2017.

13.     Defendant Emily Weber ("Weber") is a citizen and resident of St. Clair County, Illinois.  At all times relevant herein, Weber was employed as a teacher for Illinois Central School District 104 until approximately May of 2017.

14.     Defendant Derek Morgan ("Morgan") is a citizen and resident of St. Clair County, Illinois.  At all times relevant herein, Morgan was and is employed as a teacher for Illinois Central School District 104.

15.     Defendant Sarah Svoboda ("Svoboda") is a citizen and resident of St. Clair County, Illinois.  At all times relevant herein, Svoboda served and serves as the President of the Illinois Central School District 104 Board of Education.

## FACTS

**The January 18, 2017 Slave Incident:**

16.     At all times relevant herein, A.A. and C.P. were enrolled as students at JAMS.

17.     During the 2016-2017 school year, A.A. was in the seventh grade, and C.P. was in the eighth grade.

18.     During the 2016-2017 school year, Heuring taught literature to both A.A. and C.P.

19.     During the 2016-2017 school year, Heuring also served as an advisor for the JAMS Student Council, of which both A.A. and C.P. were student members.

20.     On or about January 18, 2017, the Student Council advisors and student members met in a classroom at JAMS.

21.     Upon entering the classroom, Heuring referred to C.P. as her "*slave*" and "*Slave Number Four,*" and further directed C.P. to get her jacket, which was located outside of the classroom in another part of the school building.

22.     Heuring made these statements in the presence of A.A. and other students, as well as another teacher.

23.     When a Caucasian student asked Heuring if he could also be her slave, she told him no, but stated that A.A. was also her "*slave*" and referred to A.A. as "*Slave Number One because she's been with me the longest.*"

24.     When C.P. returned to the room with Heuring's jacket, Heuring again referred to C.P. as "*Slave Number Four*."

25.     The statements made by Heuring were racially derogatory, humiliating and caused C.P. and A.A. to suffer embarrassment and emotional distress.

26.     That same day, C.P. reported the incident to his mother, Krista.

27.     That same day, A.A. reported the incident to her mother, Stephanie.

28.     The next day, January 19, 2017, Krista and Stephanie contacted the Superintendent, John Bute ("Bute"), and reported the statements made by Heuring in which she referred to C.P. and A.A. as her "slaves" (the "January 18, 2017 Slave Incident").

29.     Thereafter, Krista, Todd, Theo and Stephanie, on behalf of C.P. and A.A., repeatedly reported and complained to the Board and Defendant Svoboda about the racial discrimination.

30.     As a direct and proximate result of the efforts by the Plaintiffs to report and oppose racial discrimination, the Defendants undertook actions to intimidate and retaliate against C.P., A.A. their parents, as well as others who associated with them.

**The F-List:**

31.     From approximately August of 2014 to May 22, 2017, Illinois Central School District 104 employed C.P.'s father, Todd, as a JAMS boys' basketball coach.

32.     During the 2016-2017 season, Todd was JAMS's Head Boys Basketball Coach.

33.     Under Todd's coaching, the JAMS boys' basketball team enjoyed an unprecedented level of success on the court.  For the first time in JAMS history, the team was on track to play in the state championship tournament.

34.    After the January 18, 2017 Slave Incident, several African American and/or mixed race JAMS students began to appear on a list (the "F List") disallowing them from participating on the basketball team that Todd coached.

35.    Defendant Weber, a math teacher and friend to Defendants Heuring and Morgan, refused to enter these students' grades into the school's grading system prior to the games, despite the fact that she had graded the relevant assignments, quizzes, and/or tests before the games were played.

36.    Because Defendant Weber refused to timely enter these students' grades into the school's grading system, they were placed on the F List and not permitted to play in critical basketball games leading up to the state championship tournament.

37.    Between the January 18, 2017 Slave Incident and the date of the state championship tournament on February 10, 2017, four of the five starting players for the JAMS 2016-2017 eighth grade boys' basketball team were put on the F List at some point.

38.    Defendant Weber refused to timely enter these students' grades in retaliation for Plaintiffs reporting racial discrimination against Defendant Heuring.

**Plaintiffs' Continuing Efforts to Oppose Racial Discrimination**:

39.    Over the weeks following the January 18, 2017 Slave Incident, the Plaintiffs and other African American and mixed-race parents complained about the racial discrimination and the efforts by one or more of the Defendants to target African American and mixed race students to prevent them from playing on the basketball team coached by C.P.'s father, Todd.

40.    On February 8, 2017, the Board called an emergency meeting.

41.    At the February 8, 2017, Board meeting, several individuals made public comments relating to the grading system at JAMS.

42.     Gregory questioned why so many African American students were being placed on the F List.

43.     The Board and Defendant Svoboda refused to allow Krista, Todd, Theo and Stephanie to address the Board in closed session to discuss the January 18, 2017 Slave Incident.

44.     On February 13, 2017, the Board conducted a regular school board meeting.

45.     At the February 13, 2017 meeting, Stephanie and Krista voiced their concerns and complaints about the January 18, 2017 Slave Incident and asked why no action had been taken regarding the incident.  Todd stood next to Krista as she spoke, and Theo stood next to Stephanie as she spoke.

46.     Gregory also spoke at the February 13, 2017 meeting, stating that under no circumstances should a student be addressed as a slave, and indicating that the school needed to "get serious" about addressing its culture.

47.     Boykin was present at the February 13, 2017 meeting, and sat with a group of parents of African American and mixed-race children who showed their support for C.P., A.A., and their parents.

**Defendant Heuring's Facebook Messaging to Rally Students to Retaliate Against Plaintiffs:**

48.     On the afternoon of February 15, 2017, the Board gave notice that a special meeting would be held on February 16, 2017.

49.     That same evening, on February 15, 2017, Heuring contacted a high school student via Facebook messaging, stating that a group of parents "*have been causing problems all year*" and "*are now coming after me*" because of the January 18, 2017 Slave Incident and the "*basketball issue*."  Heuring informed the student that she would have to appear in front of the Board in executive session the following night.

50.    The student responded to Heuring Facebook message by asking: "*What do you need me to do?*"

51.    Heuring replied:

"*I don't know if it's the right thing or not, but can you be there tomorrow night? Can you rally any and all JAMS students that's know that I'm not the monster they are portraying me to be?*"

52.    Heuring's recitation of the facts relating to the January 18, 2017 Slave Incident and the "*basketball issue*" contained in her Facebook message was intentionally false and/or misleading, and was intended to rally students in opposition to, and in retaliation of, the Plaintiffs and others who were opposing racial discrimination by the Defendants.

53.    Heuring knew, or should have known, that her contact with the student via Facebook messaging was in violation of Central School District 104's written policies regarding the use of social media by teachers other personnel.

54.    At Heuring's instruction, urging and/or request, the high school student rallied other students to attend the February 16, 2017 special school board meeting.

55.    Upon information and belief, Heuring's Facebook message was posted or published to one or more Facebook groups where it was seen by other students in an effort to rally those students to attend the February 16, 2017 special school board meeting in opposition to, and in retaliation of, the Plaintiffs and others who were opposing racial discrimination by the Defendants.

56.    Heuring knew, or should have known, that both C.P. and A.A. would likely be attending the same high school with these other students when they graduated from JAMS.

**The Pizza Party:**

57.    On February 16, 2017, the Board held a special school board meeting.

58.    At the February 16, 2017 special school board meeting, a group of high school students who had been rallied to attend the meeting at the instruction, urging and/or request of Heuring appeared and were permitted to speak by the Board and Defendant Svoboda in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination.

59.    After speaking before the Board, the group of high school students who had been rallied at the instruction, urging and/or request of Heuring to attend the February 16, 2017 special school board meeting met in a nearby classroom with Defendants Heuring, Weber and Morgan.

60.    Upon information and belief, Defendants Heuring, Weber and/or Morgan purchased pizza as an inducement to, and in exchange for, the high school students rallying to appear in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination (hereinafter referred to as the "Pizza Party").

61.    Defendants Heuring, Weber and Morgan knew, or should have known, that rallying high school students in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination would discourage A.A., C.P. and others from reporting and opposing discriminatory conduct.

62.    Defendants Heuring, Weber and Morgan knew, or should have known, that offering, paying for and providing high school students free pizza and throwing a Pizza Party on school grounds in exchange for, and as an inducement to, soliciting and rallying said high school students in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination would discourage A.A., C.P. and others from reporting and opposing discriminatory conduct.

63.     Defendants Heuring, Weber and Morgan knew, or should have known, that C.P. and A.A. would be intimidated by seeing a group of high school students, with whom they would likely be attending school upon their graduation from JAMS, appear at a special school board meeting to speak in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination.

**Defendants' Rallying of Other Teachers to Retaliate Against Plaintiffs:**

64.     In addition to being a teacher, Defendant Morgan was, at all times relevant herein, a co-president of the Illinois Central Federation of Teachers and Support Staff Local Union 4673.

65.     Upon information and belief, Defendants Heuring, Weber and Svoboda are also members of the Illinois Central Federation of Teachers and Support Staff Local Union 4673

66.     In addition to rallying high school students to appear at the February 16, 2017 special school board meeting to speak in opposition to, and in retaliation of, the Plaintiffs' complaints of racial discrimination, one or more of the Defendants encouraged, solicited and/or requested that other teachers employed by Illinois Central School District 104 appear at the February 16, 2017 special school board all wearing matching teacher union shirts.

67.      At the encouragement, solicitation and/or request of one or more of the Defendants, a group of teachers, including Heuring, Weber and Morgan, appeared at the February 13, 2017 regular school board meeting and the February 16, 2017 special school board meeting all wearing matching teacher union shirts.

68.     At the encouragement, solicitation and/or request of one or more of the Defendants, the group of teachers who were all wearing matching teacher union shirts, including

Heuring, Weber and Morgan, sat in the front rows of the February 13, 2017 regular school board meeting and the February 16, 2017 special school board meeting.

69.    Heuring, Weber and Morgan encouraged, solicited and/or requested the teachers, including one another, to appear at the February 16, 2017 special school board meeting wearing matching teacher union shirts and to sit in the front rows of the meeting in an effort to intimidate and discourage the Plaintiffs and others from voicing complaints regarding racial discrimination, and in retaliation for doing so.

70.    The Defendants intended to intimidate Plaintiffs by sitting in the front rows of the February 13, 2017 regular school board meeting and the February 16, 2017 special school board meeting, all wearing matching teacher union shirts in opposition to, and in retaliation of, the Plaintiffs' and others' complaints of racial discrimination.

71.    Defendants Svoboda and the Board permitted and/or condoned the actions of Defendants Heuring, Weber and/or Morgan to intimidate and retaliate against the Plaintiffs and others at the February 13, 2017 regular school board meeting and the February 16, 2017 special school board meeting, and took no action to prevent said activities.

**Retaliation Against A.A.:**

72.    Defendants Heuring and Weber denied A.A. equal access to educational services by unlawfully discriminating against her and then retaliating against her for reporting the discrimination.

73.    As a direct and proximate result of the January 18, 2017 Slave Incident, and being required to continue to sit in a classroom with a teacher who had openly and repeatedly referred to her as a "*slave*" and "*Slave Number One,*" and who had participated in organizing concerted

efforts of intimidation and retaliation against A.A., her family and others, A.A. experienced severe emotional distress when attending Defendant Heuring's literature class.

74.     As a direct and proximate result of the emotional distress suffered by A.A. when being required to sit in Defendant Heuring's literature class, A.A. also began missing several days of school.

75.     As a direct and proximate result of the January 18, 2017 slave incident, and being required to continue to sit in a classroom with a teacher who had openly and repeatedly referred to her as a "*slave*" and *"Slave Number One,"* and who had participated in organizing concerted efforts of retaliation against A.A., her family and others, A.A.'s grades in Defendant Heuring's literature class began to fall dramatically.

76.     A.A.'s mother, Stephanie, complained to Superintendent Bute and others that A.A.'s grades were falling due to the racial discrimination, humiliation and retaliation A.A. had suffered as a direct and proximate result of the January 18, 2017 Slave Incident and the subsequent retaliation against those who spoke out against said discrimination on A.A.'s behalf, as well as due to being forced to continue to sit in Heuring's class.

77.     A.A. was eventually allowed to study literature in the library with a teacher other than Heuring during her usual literature class time.

78.     After being removed from Heuring's class and no longer being forced to sit in a classroom with a teacher who had referred to her as a "*slave*" and *"Slave Number One,"* and who participated in organizing concerted efforts of intimidation and retaliation against A.A., her family and others, A.A.'s literature grades began to  improve.

79.     In addition to Defendant Heuring's literature class, A.A. was required to continue to attend advanced math class conducted by Defendant Weber.

80.    In retaliation for reporting and complaining of racial discrimination and retaliation, Defendant Weber frequently refused to look at or talk to A.A., causing A.A. to become suffer additional emotional distress when attending Defendant Weber's advanced math class, as well as the study period she had in Weber's classroom.

81.    In retaliation for reporting and complaining of racial discrimination and retaliation, Defendant Weber refused to enter A.A.'s grades into the school's record system, refused to give A.A. credit for assignments that had been properly completed, and refused to enter A.A.'s grades from her completed makeup work from days she missed school.

82.    A.A.'s mother, Stephanie, was forced to go to a school administrator multiple times to report the discriminatory and retaliatory actions of Defendant Weber and to request that A.A.'s grades be entered into the school's grading system.  Even then, not *all* of the makeup assignments were appropriately entered before the end of the school year.

83.    A.A. and her parents made repeated requests that the School provide her an alternative advanced math class with a different teacher or tutor.

84.    The Defendants refused and/or denied the repeated requests that A.A. be provided with an alternative advanced math class with a different teacher or tutor, and indicated that A.A.'s only option would be to take regular math, because no other qualified teachers had time to teach or tutor A.A. in advanced math.

85.    A high school student eventually tutored A.A. at the request of A.A.'s parents.

86.    The actions of the Defendants denied A.A. equal access to educational services by unlawfully discriminating against her and retaliating against her for reporting and opposing the discrimination and retaliation directed against her, and others associated with her.

**Retaliation Against C.P.:**

87.     At all times relevant herein, Illinois Central School District 104 had a contractual relationship with Aramark Educational Services, LLC ("Aramark") for the provision of food services at its two schools.

88.     Beginning in August of 2007 and at all times relevant herein, Aramark and its predecessor employed C.P.'s mother, Krista, as a worker assigned to Illinois Central School District 104's school cafeterias.

89.     Beginning in approximately August of 2016, Krista was assigned to work as a cashier at the JAMS cafeteria.

90.     In retaliation for C.P. and Krista's efforts to oppose racial discrimination against C.P. and others, Defendant Morgan sent correspondence to Krista's supervisor and/or manager, suggesting that Krista did not get along with JAMS teachers and/or staff and/or otherwise falsely portraying Krista as a substandard worker.

91.     As a direct and proximate result of Defendant Morgan's efforts to retaliate against C.P. and his mother Krista, Krista's supervisor informed her that she would not be considered for a promotion because it had been reported that she did not get along with the JAMS teachers and/or staff.

92.     On May 12, 2017, Defendant Svoboda signed a letter addressed to Krista's employer Aramark stating:

> "On behalf of the Board of Education of Central School District #104, St. Clair County, Illinois, this letter shall serve as your notice that Central School District #104 is requesting that one of your employees, Mrs. Krista Porter, be moved and transferred out of Joseph Arthur Middle School.  It is also the request of the Board of Education that this move be made as soon as possible."

93.    Upon information and belief, the Board had not previously held a meeting to discuss the request to move Krista and transfer her out of JAMS.

94.    Upon information and belief, the Board had not previously approved any action to request that Krista be moved and transferred out of JAMS.

95.    Krista was given not advance notice or warning by Defendant Svoboda or the Board that a letter was being sent to her employer requesting that she be moved and transferred out of JAMS as soon as possible.

96.    Defendant Svoboda signed the May 12, 2017 letter requesting that Krista be moved and transferred out of JAMS as soon as possible in retaliation for C.P., Krista and others reporting and opposing racial discrimination.

97.    Defendant Svoboda authorized and/or otherwise caused the May 12, 2017 letter to be sent to Krista's employer in retaliation for C.P., Krista and others reporting and opposing racial discrimination.

98.    As a direct and proximate result of the actions of Defendant Svoboda and the other Defendants, Krista was forcibly removed and escorted from the JAMS premises on May 16, 2017.

99.    As a direct and proximate result of the actions of Defendant Svoboda and the other Defendants, Krista was reassigned to CES and demoted to the position of dishwasher.

**Retaliation Against C.P. , Todd, Gregory and Boykin:**

100.    In February of 2017, C.P.'s father, Todd, took the JAMS varsity basketball team to the Illinois State Tournament for the first time in the school's history.

101.    Under Todd's coaching, the JAMS varsity basketball team ultimately placed fourth overall at the State Tournament, the highest ranking it had ever achieved.

102.    Todd achieved this success, despite having four of his five starting players placed on the F List in retaliation for A.A., C.P., Todd and his wife, Krista and others reporting and opposing racial discrimination and retaliation.

103.    As a result of Todd's accomplishments, Todd was selected as Co-Coach of the Year by the Illinois Basketball Coaches Association, which is the first time a JAMS coach had been nominated for the award.

104.    Despite these unprecedented achievements, on May 8, 2017, the Board held a meeting where it approved the non-renewal of Todd's contract for the following year, as well as the contracts of coaches Gregory and Boykin.

105.    On May 11, 2017, Defendant Svoboda signed letters addressed to Todd, Gregory, and Boykin, stating that their contracts would not be renewed, and terminating their services as of the effective date of May 22, 2017.  The letters invited the coaches to reapply for any positions available the following school year once the positions were posted on the school website.

106.    Following the end of the 2016-17 school year, Todd, Gregory, and Boykin reapplied for their respective coaching positions.

107.    Todd, Gregory, and Boykin were never even interviewed for the coaching positions by the Defendants.

108.    On August 14, 2017, the Board held a regular board meeting.

109.    During the August 14, 2017 meeting, Chris Monroe ("Monroe"), a member of the Board during the 2016-17 school year, resigned and read out loud to the board members and visitors present his resignation letter wherein Monroe stated that he could "*no longer be an*

*effective Board Member due, in large part, to decisions and collective actions of this Board.*"

Monroe further stated:

> "*[W]hen do we no longer hire the best candidate for an open position? Last spring we terminated a coach that led our kids to the State Tournament Final Four and was Coach of the Year [Todd]. My belief is that we hire the best person regardless of age, gender, race or nationality. . . . I have lost confidence that this Board can make an unbiased decision.*"

110.    At the August 14, 2017 board meeting, the Board decided to re-hire coach Bill Brunner ("Brunner"), a Caucasian male who, unlike Todd, Gregory, and Boykin, had not voiced any opposition to racial discrimination and retaliation at the Defendant's board meetings.

## COUNT 1
### Violation of Title VI (Discrimination) – A.A. and C.P. against the Board

111.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

112.    Title VI of the Civil Right Act provides:

No person in the United States shall, on ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

113.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a program or activity receiving federal financial assistance and otherwise met all of the other relevant criteria of Title VI for status as a defendant to a Title VI suit.

114.    At all times relevant herein, Plaintiffs A.A. and C.P. were beneficiaries of federal assistance to public schools.

115.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single

African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

116.    A representative, agent, or employee of the Board, and Illinois Central School District 104 itself, discriminated against A.A. and C.P. in that:

    a.    Heuring, a representative, agent, or employee of Illinois Central School District 104, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

    b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

    c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

    d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

    e.    Such actions were taken based on A.A. and C.P.'s race;

    f.    There was no legitimate basis for such differential treatment of A.A. and C.P.; and

    g.    Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of access to educational benefits.

117.    The Board invested an official or officials who had actual knowledge of such actions with the duty to supervise Heuring and the power to take action that would end such abuse, but such official or officials failed to do so, or failed to do so in a timely manner.

118.    Illinois Central School District 104 and the Board were deliberately indifferent in responding to such actions, in that school administration was aware of such actions at least on the day after their occurrence, but the Board did not reprimand Heuring until almost one month

after the occurrence, after A.A. and C.P.'s parents complained of the events on several occasions, and the reprimand imposed did not prevent further retaliation against A.A. and C.P., as well as others, for their complaints.

119.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

## COUNT 2
### Violation of Title VI (Retaliation) – A.A. and C.P. against the Board

120.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to110 as if set forth fully herein.

121.    Title VI of the Civil Right Act provides:

No person in the United States shall, on ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

122.    Title VI's implementing regulation prohibits retaliation: no recipient of federal funding "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI] *** because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VI]." 34 C.F.R. § 100.7(e).

123.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a program or activity receiving federal financial assistance and otherwise met all of the other relevant criteria of Title VI for status as a defendant to a Title VI suit.

124.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

125.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

126.    A.A. and C.P., individually and by and through their parents, voiced concerns to Illinois Central School District 104 and the Board regarding the discriminatory and unfair treatment they had experienced on or about January 18, 2017.

127.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

128.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Illinois Central School District 104 and the Board, by and through its representatives, agents, and/or employees, engaged in a pattern of retaliation and harassment against A.A. and C.P., including without limitation:

   a.    seeking to intimidate C.P., a minor child, during the investigation of his complaint of discrimination regarding the events of January 18, 2017;

   b.    manipulating the entry of black student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to retaliate against, intimidate and punish A.A. and C.P.;

   c.    conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;

   d.    conspiring with and recruiting teachers to wear union shirts and sit in the front rows of school board meetings attended by A.A.,C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A., C.P., and those with whom they associated;

   e.    sending a letter to the employer of C.P.'s mother, Krista, suggesting or stating that Krista did not get along with teachers and/or staff at JAMS and/or otherwise portraying Krista as a substandard worker.

   f.    assigning a teacher who refused to properly educate A.A., speak to A.A., look at A.A., and who manipulated A.A.'s grades in retaliation for A.A. and C.P.'s complaints with respect to the January 18, 2017 Slave Incident;

   g.    terminating the only African-American coaches employed by the school, including C.P.'s father and two other parents who complained about the unfair treatment A.A. and C.P. at JAMS, in order to retaliate against, intimidate and punish A.A. and C.P.;

   h.    directing and/or causing the demotion of C.P.'s mother from her position as cashier in the JAMS cafeteria, and the forcible removal of C.P.'s mother from the JAMS premises, in order to retaliate against, intimidate, and punish A.A. and C.P.; and

      i.      permitting, causing, or contributing to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., their respective parents and others with whom they associated, for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of Illinois Central School District 104, the Board, its representatives, agents, and/or employees.

129.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

## COUNT 3
### Violation of the Illinois Civil Rights Act of 2003 (Discrimination) – A.A. and C.P. against the Board

130.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

131.    The Illinois Civil Rights Act states, in relevant part:

(a)    No unit of State, county, or local government in Illinois shall:

(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

740 ILCS § 23/5.

132.    At all times relevant herein, Illinois Central School District 104 and its Board constituted a unit of State, county, or local government in Illinois.

133.    At all times relevant herein, Illinois Central School District 104 and its Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

134.    A representative, agent, or employee of Illinois Central School District 104 and the Board, and Illinois Central School District 104 and the Board itself, discriminated against A.A. and C.P. in that:

    a.    Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

    b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

    c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

    d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

    e.    Such actions were taken based on A.A. and C.P.'s race;

f.    There was no legitimate basis for such differential treatment of A.A. and C.P.; and

g.    Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of access to educational benefits.

135.    The Board invested an official or officials who had actual knowledge of such actions with the duty to supervise Heuring and the power to take action that would end such abuse, but such official or officials failed to do so, or failed to do so in a timely manner.

136.    Illinois Central School District 104 and its Board were deliberately indifferent in responding to such actions, in that school administration was aware of such actions at least on the day after their occurrence, but the Board did not reprimand Heuring until almost one month after the occurrence, after the parents of A.A. and C.P. complained of the events on several more occasions, and the reprimand imposed did not prevent further retaliation against A.A. and C.P., as well as others, for their complaints.

137.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

**Count 4**
**Violation of the Illinois Civil Rights Act of 2003 (Retaliation) –**
**A.A. and C.P. against the Board**

138.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to110 as if set forth fully herein.

139.    The Illinois Civil Rights Act states, in relevant part:

(a)    No unit of State, county, or local government in Illinois shall:

   (1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or

   (2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

740 ILCS § 23/5.

140.    The Illinois Civil Rights Act, patterned after Title VI, permits retaliation claims.

141.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a unit of State, county, or local government in Illinois.

142.    At all times relevant herein, Illinois Central School District 104 and the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Central 104 is located in a community with a significant African American population and has a significant African American student population.

143.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as

"slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

144.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding the discriminatory and unfair treatment they had experienced on or about January 18, 2017.

145.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

146.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Illinois Central School District 104 and the Board, by and through its representatives, agents, and/or employees, engaged in a pattern of retaliation and harassment against them, including without limitation:

> a.    seeking to intimidate C.P., a minor child, during the investigation of his complaint of discrimination regarding the January 18, 2017 Slave Incident;
>
> b.    manipulating the entry of black student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to retaliate against, intimidate and punish A.A. and C.P.;
>
> c.    conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;
>
> d.    conspiring with and recruiting teachers to wear union shirts and sit in the front rows of school board meetings attended by A.A.,C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A., C.P., and those with whom they associated;
>
> e.    sending a letter to the employer of C.P.'s mother, Krista, suggesting or stating that Krista did not get along with teachers and/or staff at JAMS and/or otherwise portraying Krista as a substandard worker.

f.     assigning a teacher who refused to properly educate A.A., speak to A.A., look at A.A., and who manipulated A.A.'s grades in retaliation for A.A. and C.P.'s complaints with respect to the January 18, 2017 Slave Incident;

g.     terminating the only African-American coaches employed by the school, including C.P.'s father and two other parents who complained about the unfair treatment A.A. and C.P. at JAMS, in order to retaliate against, intimidate and punish A.A. and C.P.;

h.     directing and/or causing the demotion of C.P.'s mother from her position as cashier in the JAMS cafeteria, and the forcible removal of C.P.'s mother from the JAMS premises, in order to retaliate against, intimidate, and punish A.A. and C.P.; and

i.     permitting, causing, or contributing to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., their respective parents and others with whom they associated, for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of Illinois Central School District 104.

147.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)     Compensatory damages;

(b)     Prejudgment interest;

(c)     Attorneys' fees and costs; and

(d)     All other relief that the Court deems just and proper.

**COUNT 5**
**42 U.S.C. § 1983 (Discrimination) – A.A. and C.P. against the Board**

148.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

149.    At all times relevant herein, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race.

150.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

151.    A representative, agent, or employee of Illinois Central School District 104 and the Board, and Illinois Central School District 104 and the Board itself discriminated against A.A. and C.P. in that:

    a.    Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

    b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

    c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

    d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

    e.    Such actions were taken based on A.A. and C.P.'s race;

f.    There was no legitimate basis for such differential treatment of A.A. and C.P.; and

g.    Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of access to educational benefits.

152.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution.

153.    The Board invested an official or officials who had actual knowledge of such actions with the duty to supervise Heuring and the power to take action that would end such abuse, but such official or officials failed to do so, or failed to do so in a timely manner.

154.    Illinois Central School District 104 and the Board were deliberately indifferent in responding to such actions, in that school administration was aware of such actions at least on the day after their occurrence, but did not reprimand Heuring until almost one month after the occurrence, after A.A. and C.P.'s parents complained of the events on several more occasions, and the reprimand imposed did not prevent further retaliation against A.A. and C.P., as well as others, for their complaints.

155.    At all relevant times, the Board acted under color of state law.

156.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the denial of their equal protection rights under the U.S. Constitution as well as their free speech rights, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

**COUNT 6**
**42 U.S.C. § 1983 (Retaliation) – A.A. and C.P. against the Board**

157.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

158.    At all times relevant herein, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race and free speech rights to oppose the same.

159.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

160.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

161.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

162.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

163.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

164.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Illinois Central School District 104 and the Board,  by and through its representatives, agents, and/or employees, engaged in a pattern of retaliation and harassment against them, including without limitation:

    a.    seeking to intimidate C.P., a minor child, during the investigation of his complaint of discrimination regarding the January 18, 2017 Slave Incident;

    b.    manipulating the entry of black student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to retaliate against, intimidate and punish A.A. and C.P.;

    c.    conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;

    d.    conspiring with and recruiting teachers to wear union shirts and sit in the front rows of school board meeting attended by A.A., C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A., C.P. and those with whom they associated;

    e.    sending a letter to the employer of C.P.'s mother, Krista, suggesting or stating that Krista did not get along with teachers and/or staff at JAMS and/or otherwise portraying Krista as a substandard worker.

    f.    assigning a teacher who refused to properly educate A.A., speak to A.A., look at A.A., and who manipulated A.A.'s grades in retaliation for A.A. and C.P.'s complaints with respect to the January 18, 2017 Slave Incident;

g.       terminating the only African-American coaches employed by the school, including C.P.'s father and two other parents who complained about the unfair treatment A.A. and C.P. at JAMS, in order to retaliate against, intimidate and punish A.A. and C.P.;

h.       directing and/or causing the demotion of C.P.'s mother from her position as cashier in the JAMS cafeteria, and the forcible removal of C.P.'s mother from the JAMS premises, in order to retaliate against, intimidate, and punish A.A. and C.P.; and

i.       permitting, causing, or contributing to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., their respective parents and others with whom they associated, for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of Illinois Central School District 104.

165.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, as well as their free speech rights.

166.    The Board's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race, as well as their free speech rights to oppose the same.

167.    At all relevant times, the Board acted under color of state law.

168.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

## COUNT 7
### 42 U.S.C. § 1983 (Discrimination) – A.A. and C.P. against Heuring

169.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

170.    At all times relevant herein, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race.

171.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

172.    Heuring unlawfully discriminated against A.A. and C.P. in that:

   a.    Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

   b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

   c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

   d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

   e.    Such actions were taken based on A.A. and C.P.'s race;

    f.    There was no legitimate basis for such differential treatment of A.A. and C.P.; and

    g.    Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of denial of full and equal enjoyment of Central 104's services.

173.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution.

174.    Heuring's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race.

175.    At all times relevant herein, Heuring acted under color of state law.

176.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the denial of their equal protection rights under the U.S. Constitution, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Andrea Heuring and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Punitive Damages in excess of $500,000.00;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

<u>**COUNT 8**</u>
**42 U.S.C. § 1983 (Retaliation) – A.A. and C.P. against Heuring**

177.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

178.    At all relevant times, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race, as well as free speech rights to oppose the same.

179.    At all relevant times, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

180.    On or about January 18, 2017, Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

181.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

182.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

183.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

184.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Heuring retaliated against them by:

    a.    conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;

    b.    conspiring with and recruiting other teachers to wear union shirts and sit in the front rows of school board meeting attended by A.A.,C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A. and C.P.; and

    c.    permitting, causing, or contributing numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., and others with whom they associated for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to her racially discriminatory acts.

185.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, as well as their free speech rights.

186.    Heuring's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race, as well as their free speech rights to oppose the same.

187.    At all times relevant herein, Heuring acted under color of state law.

188.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Andrea Heuring and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Punitive Damages in excess of $500,000.00;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

## COUNT 9
### 42 U.S.C. § 1983 (Retaliation) – A.A. and C.P. against Weber

189.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

190.    At all relevant times, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race, as well as free speech rights.

191.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

192.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

193.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

194.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

195.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Weber retaliated against them in one or more of the following ways:

a.    Weber manipulated the entry of black and mixed-race student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to retaliate against and punish A.A. and C.P. and to send a signal to other black and mixed-race students;

b.    Weber conspired with and recruited students from the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P. by offering them pizza in exchange for speaking in support of Heuring at the meeting and in opposition to A.A. and C.P.;

c.    Weber conspired with and recruited teachers from the teachers' union of which she was a member and who taught at A.A. and C.P.'s school to attend school board meetings in matching union shirts and sit in the front rows of those meetings in order to intimidate A.A., C.P. and others with whom they associated;

d.    Weber refused to properly educate A.A., speak to A.A., or look at A.A., and manipulated A.A.'s grades in retaliation for A.A. and C.P.'s complaint with respect to the January 18, 2017 Slave Incident; and

e.    Weber permitted, caused, or contributed to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., and others with whom they associated for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of the Board, its representatives, agents, and/or employees.

196.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, as well as their free speech rights.

197.    Weber's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race, as well as their free speech rights to oppose the same.

198.    At all times herein, Weber acted under color of state law.

199.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Emily Weber and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Punitive Damages in excess of $500,000.00;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

## COUNT 10
### 42 U.S.C. § 1983 (Retaliation) – A.A. and C.P. against Morgan

200.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

201.    At all relevant times, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race, as well as free speech rights.

202.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

203.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they

reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

204.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

205.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

206.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Morgan retaliated against them in one or more of the following ways:

    a.    Morgan conspired with and recruited students from the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P. by offering them pizza in exchange for speaking in support of Heuring at the meeting and in opposition to A.A. and C.P.;

    b.    Morgan conspired with and recruited teachers from the teachers' union over which he presided and who taught at A.A. and C.P.'s school to attend school board meetings in matching union shirts and sit in the front rows of those meetings in order to intimidate A.A., C.P. and others with whom they associated;

    c.    Morgan sent a letter to the employer of C.P.'s mother, Krista, suggesting or stating that Krista did not get along with teachers and/or staff at JAMS and/or otherwise portraying Krista as a substandard worker.

    d.    Morgan permitted, caused, or contributed to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., and others with whom they associated for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of the Board, its representatives, agents, and/or employees.

207.    Such actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, as well as their free speech rights to oppose such a violation.

208.    Morgan's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race, as well as their free speech rights to oppose the same.

209.    At all times relevant herein, Morgan acted under color of state law.

210.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Derek Morgan and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Punitive Damages in excess of $500,000.00;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

### Count 11
### Violation of Title VI (Discrimination) –
### Todd Porter, Marcus Gregory and Christopher Boykin against the Board

211.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

212.    Title VI of the Civil Right Act provides:

No person in the United States shall, on ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

213.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a program or activity receiving federal financial assistance and otherwise met all of the other relevant criteria of Title VI for status as a defendant to a Title VI suit.

214.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

215.    Upon information and belief, Illinois Central School District 104 and the Board receive federal financial assistance for the purpose of creating jobs and maintaining existing jobs within the school system.

216.    The Board's employment discrimination described herein tends to infect its students' entitlement to Illinois Central School District 104's services, programs, and activities.

217.    At all times relevant herein, Todd, Gregory, and Boykin were and are members of a protected class, being African American, and also associating with C.P. and A.A., who were and are also members of a protected class.

218.    A representative, agent, or employee of Illinois Central School District 104 and the Board, and Illinois Central School District 104 and the Board itself discriminated against Todd, Gregory, and Boykin in that:

        a.     The Board terminated Todd, Gregory and Boykin as coaches after taking the JAMS boys' basketball team to the state tournament for the first time in JAMS history, and despite Todd being recognized

for being selected as an Illinois Basketball Coaches' Association Coach of the Year;

b.      There was no legitimate business reason for the termination of Todd, Gregory and Boykin and any reason given by the Board, including without limitation that they were not salaried employees, was pretextual;

c.      When Todd, Gregory and Boykin reapplied for their positions, they were never interviewed;

d.      The Board re-hired a Caucasian coach who was not a salaried employee, and who did not voice opposition to racial discrimination and retaliation.

219.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

220.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits, and other compensation which his employment entailed, as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)     Compensatory damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary;

(b)     Prejudgment interest;

(c)     Attorneys' fees and costs; and

(d)     All other relief that the Court deems just and proper.

## COUNT 12
### Violation of Title VI (Retaliation) –
### Todd Porter, Marcus Gregory and Christopher Boykin against the Board

221.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

222.    Title VI of the Civil Right Act provides:

No person in the United States shall, on ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

223.    Title VI's implementing regulation prohibits retaliation: no recipient of federal funding "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI] *** because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VI]." 34 C.F.R. § 100.7(e).

224.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a program or activity receiving federal financial assistance and otherwise met all of the other relevant criteria of Title VI for status as a defendant to a Title VI suit.

225.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

226.    The Board receives federal financial assistance for the purpose of creating jobs and maintaining existing jobs within the school system.

227.    The Board's employment discrimination described herein tends to infect its students' entitlement to services, programs, and activities.

228.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

229.    A.A. and C.P., individually and by and through their respective parents and others on their behalf, including Todd, Gregory and Boykin, voiced concerns regarding the January 18, 2017 Slave Incident to Illinois Central School District 104 and the Board.

230.    Todd and Gregory complained to the Board on multiple occasions regarding the discriminatory treatment of A.A. and C.P., and the retaliation they and others with whom they associated experienced for reporting the same.  Boykin was present at the Board meetings at which Todd and Gregory voiced their complaints, and showed his support for Todd, Gregory, A.A., C.P. and their families at such meetings.

231.    Todd, Gregory and Boykin reasonably and in good faith believed that the Board and its representatives, agents, and/or employees, acted in a discriminatory and retaliatory manner toward A.A., C.P., and others with whom they associated.

232.    Todd, Gregory and Boykin's actions described above constituted protected activities.

233.    Following Todd, Gregory and Boykin's actions described above, the Board retaliated against them by terminating their employment as coaches at JAMS.

234.    Todd, Gregory and Boykin were the only African American coaches employed by the school at the time of their termination, and the only coaches who voiced complaints regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced.

235.    White and/or non-African American coaches, who did not complain about the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced, were not terminated.

236.    Following the termination of Todd, Gregory and Boykin, the only African American employed by Illinois Central School District 104 was a janitor.

237.    There was no legitimate business reason for the termination of Todd, Gregory or Boykin, and the reason given by the Board for the termination of Todd, Gregory and Boykin, if any, was pretextual.

238.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

239.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits and other compensation which their employment entailed, as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

### COUNT 13
### Violation of 42 U.S.C. § 1983 (Discrimination) –
### Todd Porter, Marcus Gregory and Christopher Boykin against the Board

240.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

241.    At all times relevant herein, Todd, Gregory and Boykin had a constitutional right to be free from discrimination based on race and based on their association with C.P. and A.A., who are of mixed race and complained of discrimination at JAMS.

242.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

243.    A representative, agent, or employee of the Board, and the Board itself, discriminated against Todd, Gregory and Boykin in that:

        a.    The Board terminated Todd, Gregory and Boykin as coaches after taking the JAMS boys' basketball team to the state tournament for the first time in JAMS history, and despite Todd being recognized

for being selected as an Illinois Basketball Coaches' Association Coach of the Year;

b.      There was no legitimate business reason for the termination of Todd, Gregory and Boykin and any reason given by the Board, including without limitation that they were not salaried employees, was pretextual;

c.      When Todd, Gregory and Boykin reapplied for their positions, they were never interviewed;

d.      The Board re-hired a Caucasian coach who was not a salaried employee, and who did not voice opposition to racial discrimination and retaliation.

244.    The Board's actions were taken in violation of the equal protection right of Todd, Gregory and Boykin to be free from discrimination based on their own race and based on their association with C.P. and A.A., who are of mixed race.

245.    The Board's acts constitute acts of deliberate indifference to the equal protection right of Todd, Gregory and Boykin to be free from discrimination based on their own race and based on their association with C.P. and A.A., who are of mixed race.

246.    At all times relevant herein, the Board acted under color of state law.

247.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

248.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits, and other compensation which their employment entailed, as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory, and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)    Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)    Prejudgment interest;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

### COUNT 14
**Violation of 42 U.S.C. § 1983 (Retaliation) –**
**Todd Porter, Marcus Gregory and Christopher Boykin against the Board**

249.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

250.    At all times relevant herein, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race.

251.    At all times relevant herein, Todd, Gregory and Boykin had a constitutional right to free speech.

252.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity,

despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

253.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

254.    A.A. and C.P., individually and by and through their respective parents and others on their behalf, including Todd, Gregory and Boykin, voiced concerns regarding the January 18, 2017 Slave Incident to Illinois Central School District 104 and the Board.

255.    Todd and Gregory complained to the Board on multiple occasions regarding the discriminatory treatment of A.A. and C.P., and the retaliation they and others with whom they associated experienced for reporting the same.  Boykin was present at the Board meetings at which Todd and Gregory voiced their complaints, and showed his support for Todd, Gregory, C.P., A.A. and their families at such meetings.

256.    Todd, Gregory and Boykin reasonably and in good faith believed that the Board and its representatives, agents, and/or employees acted in a discriminatory and retaliatory manner toward A.A., C.P., and others with whom they associated.

257.    Todd, Gregory and Boykin's actions described above constituted protected activities.

258.    Following Todd, Gregory and Boykin's actions described above, the Board retaliated against them by terminating their employment as coaches at JAMS.

259.    Todd, Gregory and Boykin were the only African American coaches employed by the school at the time of their termination, and the only coaches who voiced complaints to the Board regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced.

260.    White and/or non-African American coaches, who did not complain to the Board regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced, were not terminated.

261.    Following the termination of Todd, Gregory and Boykin, the only African American employee of Illinois Central School District 104 was a janitor.

262.    The reason given by the Board for the termination of Todd, Gregory and Boykin, if any, was pretextual.

263.    The Board's actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, and the free speech rights of Todd, Gregory and Boykin to oppose the same.

264.    The Board's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race and the free speech rights of Todd, Gregory and Boykin to oppose the same.

265.    At all times relevant herein, the Board acted under color of state law.

266.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

267.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits and other compensation

which her employment entailed as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)    Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)    Prejudgment interest;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

## <u>COUNT 15</u>
### Violation of the Illinois Civil Rights Act of 2003 (Discrimination) – Todd Porter, Marcus Gregory, and Christopher Boykin against the Board

268.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

269.    The Illinois Civil Rights Act states, in relevant part:

(a)    No unit of State, county, or local government in Illinois shall:

(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

740 ILCS § 23/5.

270.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a unit of State, county, or local government in Illinois.

271.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

272.    At all times relevant herein, Todd, Gregory and Boykin were and are members of a protected class, being African Americans, and associated with mixed-race children, A.A. and C.P., who attended an Illinois Central School District 104 school and complained of discrimination against themselves by the school.

273.    A representative, agent, or employee of Illinois Central School District 104 and the Board, and the Board itself, discriminated against Todd, Gregory and Boykin in that:

a.    The Board terminated Todd, Gregory and Boykin as coaches after taking the JAMS boys' basketball team to the state tournament for the first time in JAMS history, and despite Todd being recognized for being selected as an Illinois Basketball Coaches' Association Coach of the Year;

b.    There was no legitimate business reason for the termination of Todd, Gregory and Boykin, and any reason given by the Board, including without limitation that they were not salaried employees, was pretextual;

    c.      When Todd, Gregory and Boykin reapplied for their positions, they were never interviewed;

    d.      The Board re-hired a Caucasian coach who was not a salaried employee, and who did not voice opposition to racial discrimination and retaliation.

274.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

275.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits, and other compensation which his employment entailed as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)    Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)    Prejudgment interest;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

## COUNT 16
**Violation of the Illinois Civil Rights Act of 2003 (Retaliation) –
Todd Porter, Marcus Gregory, and Christopher Boykin against Central 104**

276.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

277.    The Illinois Civil Rights Act states in relevant part:

(a)    No unit of State, county, or local government in Illinois shall:

(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

740 ILCS § 23/5.

278.    The Illinois Civil Rights Act, patterned after Title VI, permits retaliation claims.

279.    At all times relevant herein, Illinois Central School District 104 and the Board constituted a unit of State, county, or local government in Illinois.

280.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

281.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as

"slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

282.    A.A. and C.P., individually and by and through their parents on their behalf, and including Todd, Gregory, and Boykin, voiced concerns regarding the January 18, 2017 Slave Incident to Illinois Central School District 104 and the Board.

283.    Todd and Gregory complained to the Board on multiple occasions regarding the discriminatory treatment of A.A. and C.P., and the retaliation they and others with whom they associated experienced for reporting the same.  Boykin was present at the Board meetings at which Todd and Gregory voiced their complaints, and showed his support for Todd, Gregory, A.A., C.P. and their families at such meetings.

284.    Todd, Gregory and Boykin reasonably and in good faith believed that the Board and its representatives, agents, and/or employees acted in a discriminatory and retaliatory manner toward A.A., C.P., and others with whom they associated.

285.    Todd, Gregory and Boykin's actions described above constituted protected activities.

286.    Following Todd, Gregory and Boykin's actions described above, the Board retaliated against them by terminating their employment as coaches at JAMS.

287.    Todd, Gregory and Boykin were the only African American coaches employed by the school at the time of their termination, and the only coaches who voiced complaints regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced.

288.    White and/or non-African American coaches, who did not complain to the Board regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced, were not terminated.

289.    Following the termination of Todd, Gregory and Boykin, the only African American employee of Illinois Central School District 104 was a janitor.

290.    There was no legitimate business reason for the termination of Todd, Gregory or Boykin, and the reason given by the Board for the termination of Todd, Gregory and Boykin, if any, was pretextual.

291.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

292.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits and other compensation which her employment entailed as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)    Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)    Prejudgment interest;

(d)    Attorneys' fees and costs; and

(e)    All other relief that the Court deems just and proper.

### COUNT 17
**Violation of Whistleblower Act –
Todd Porter, Marcus Gregory and Christopher Boykin against the Board**

293.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

294.    Section 20.1 of the Illinois Whistleblower Act (740 ILCS 174/20.1) states:

Any other act or omission not otherwise specifically set forth in this Act, whether within or without the workplace, also constitutes retaliation by an employer under this Act if the act or omission would be materially adverse to a reasonable employee and is because of the employee disclosing or attempting to disclose public corruption or wrongdoing.

295.    At all times relevant herein, until the termination of Plaintiffs' employment, Illinois Central School District 104 and the Board was Plaintiffs' employer.

296.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

297.    A.A. and C.P., individually and by and through their respective parents on their behalf, and  including Todd, Gregory and Boykin, as employees of the Board, disclosed and attempted to disclose public corruption or wrongdoing by voicing concerns regarding the January 18, 2017 Slave Incident to Illinois Central School District 104 and the Board.

298.    Todd and Gregory complained to the Board on multiple occasions regarding the discriminatory treatment of A.A. and C.P., and the retaliation they and others with whom they associated experienced for reporting the same.  Boykin was present at the Board meetings at which Todd and Gregory voiced their complaints, and showed his support for Todd, Gregory, and their families at such meetings.

299.    Todd, Gregory and Boykin reasonably and in good faith believed that the Board and its representatives, agents, and/or employees were committing, condoning and/or actively permitting public corruption or wrongdoing toward A.A., C.P., and others with whom they associated.

300.    Todd, Gregory and Boykin's actions described above constituted protected activities.

301.    Following Todd, Gregory and Boykin's actions described above, the Board retaliated against them by terminating their employment as coaches at JAMS.

302.    The actions of Todd, Gregory and Boykin described above were a contributing factor in, and in fact the direct and proximate cause of, the Board's termination of such Plaintiffs' employment.

303.    There was no legitimate business reason for the termination of Todd, Gregory or Boykin, and the reason given by the Board for the termination of Todd, Gregory and Boykin, if any, was pretextual.

304.    The termination of the employment of Todd, Gregory and Boykin by the Board was wrongful and in retaliation for Plaintiffs exercising their rights under the Whistleblower Act, 740 ILCS 174/1 *et seq*., and was contrary to the public policy of the State of Illinois.

305.    The Board was willful and wanton in its supervision or failure to provide supervision of its representatives, agents, and/or employees, and in its termination of Todd, Gregory and Boykin for disclosing and attempting to disclose public corruption or wrongdoing by the Board, its representatives, agents, and/or employees.

306.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

307.    As a direct and proximate result of the Board's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits and other compensation which her employment entailed as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin respectfully request that this Court enter judgment against Defendant Illinois Central School District 104 Board of Education and relief in accordance therewith, including but not limited to:

(a)    An award to Todd, Gregory and Boykin of all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)    An award to make Todd, Gregory and Boykin whole by providing compensation for past and future non-pecuniary losses resulting from the Defendant's unlawful conduct, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)     An award in favor of Todd, Gregory and Boykin and against Defendant in an amount equal to two times the amount of Plaintiffs' back pay with interest.

(d)     An award in favor of Todd, Gregory and Boykin and against the Defendant to compensate Plaintiff for their reasonable attorneys' fees and costs of suit; and

(e)     Such other and further relief as this Court may deem just, fair and equitable.

## COUNT 18
### Violation of 42 U.S.C. § 1983 (Discrimination) –
### Todd Porter, Marcus Gregory and Christopher Boykin against Svoboda

308.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

309.    At all relevant times, Todd, Gregory and Boykin had a constitutional right to be free from discrimination based on race and based on their association with C.P. and A.A., who are of mixed race and who complained of discrimination against themselves by the Board and Svoboda.

310.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

311.    Svoboda discriminated against Todd, Gregory and Boykin in that:

   a.    Svoboda terminated Todd, Gregory and Boykin as coaches after taking the JAMS boys' basketball team to the state tournament for the first time in JAMS history, and despite Todd being recognized for being selected as an Illinois Basketball Coaches' Association Coach of the Year;

b.    There was no legitimate business reason for the termination of Todd, Gregory and Boykin, and any reason given by Svoboda, including without limitation that they were not salaried employees, was pretextual;

c.    When Todd, Gregory and Boykin reapplied for their positions, they were never interviewed;

d.    Svoboda re-hired a Caucasian coach who was not a salaried employee, and who did not voice opposition to racial discrimination and retaliation.

312.    Svoboda's actions were taken in violation of the equal protection right of Todd, Gregory and Boykin to be free from discrimination based on race.

313.    Svoboda's acts constitute acts of deliberate indifference to the equal protection right of Todd, Gregory and Boykin to be free from discrimination based on race.

314.    At all times relevant herein, Svoboda acted under color of state law.

315.    As a direct and proximate result of Svoboda's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

316.    As a direct and proximate result of Svoboda's unlawful conduct, Todd, Gregory and Boykin have suffered the loss of salary, wages, bonuses, benefits, and other compensation which their employment entailed, as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Sarah Svoboda and for relief in accordance therewith, including but not limited to:

(a)    Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with

prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)      Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)      Prejudgment interest;

(d)      Attorneys' fees and costs; and

(e)      All other relief that the Court deems just and proper.

### COUNT 19
**Violation of 42 U.S.C. § 1983 (Retaliation) –**
**Todd Porter, Marcus Gregory, and Christopher Boykin against Svoboda**

317.    Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

318.    At all times relevant herein, Plaintiffs A.A. and C.P. had a constitutional right to be free from discrimination based on race.

319.    At all relevant times, Todd, Gregory and Boykin had a constitutional right to free speech.

320.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

321.    On or about January 18, 2017, Heuring, a representative, agent, or employee of Illinois Central School District 104 and the Board, intentionally referred to A.A. and C.P. as

"slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

322.    A.A. and C.P., individually and by and through their respective parents on their behalf and including Todd, Gregory and Boykin, voiced concerns regarding the January 18, 2017 Slave Incident to Illinois Central School District 104 and the Board, including Svoboda.

323.    Todd and Gregory complained to Svoboda on multiple occasions regarding the discriminatory treatment of A.A. and C.P., and the retaliation they and others with whom they associated experienced for reporting the same.  Boykin was present at the Board meetings at which Todd and Gregory voiced their complaints, and showed his support for Todd, Gregory, C.P., A.A. and their families at such meetings.

324.    Todd, Gregory and Boykin reasonably and in good faith believed that the Board and its representatives, agents, and/or employees, including Svoboda, acted in a discriminatory and retaliatory manner toward A.A., C.P., and others with whom they associated.

325.    Todd, Gregory and Boykin's actions described above constituted protected activities.

326.    Following Todd, Gregory and Boykin's actions described above, Svoboda retaliated against them by terminating their employment as coaches at JAMS.

327.    Todd, Gregory and Boykin were the only African American coaches employed by the school at the time of their termination, and the only coaches who voiced complaints to the Board and Svoboda regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced.

328.    White and/or non-African American coaches, who did not complain to the Board and/or Svoboda regarding the discriminatory treatment of A.A. and C.P. and the retaliation they and those with whom they associated experienced, were not terminated.

329.    Following the termination of Todd, Gregory, and Boykin, the only African American employee of Illinois Central School District 104 was a janitor.

330.    The reason given by the Board and Svoboda for the termination of Todd, Gregory, and Boykin, if any, was pretextual.

331.    Svoboda's actions were taken in violation of the equal protection rights of A.A. and C.P. under the U.S. Constitution, and the free speech rights of Todd, Gregory and Boykin to oppose the same.

332.    Svoboda's acts constitute acts of deliberate indifference to the equal protection rights of A.A. and C.P. to be free from discrimination based on race and the free speech rights of Todd, Gregory and Boykin to oppose the same.

333.    At all times relevant herein, Svoboda acted under color of state law.

334.    As a direct and proximate result of Svoboda's unlawful conduct, Todd, Gregory and Boykin have suffered, and will continue to suffer, from severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

335.    As a direct and proximate result of Svoboda's unlawful conduct, Todd, Gregory, and Boykin have suffered the loss of salary, wages, bonuses, benefits and other compensation which her employment entailed as well as past and future emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiffs Todd Porter, Marcus Gregory and Christopher Boykin pray for Judgment against Defendant Sarah Svoboda and for relief in accordance therewith, including but not limited to:

(a)     Pecuniary damages, including all wages, benefits and compensation lost due to Defendant's unlawful conduct, including back pay and all future wage and pecuniary losses, with prejudgment interest, and such other equitable relief as may be deemed necessary to eradicate the effects of that conduct;

(b)     Non-pecuniary damages, including pain and suffering, loss of enjoyment of life, damage to reputation and humiliation, in amounts to be determined at trial;

(c)     Prejudgment interest;

(d)     Attorneys' fees and costs; and

(e)     All other relief that the Court deems just and proper.

**COUNT 20**
**Violation of Illinois Human Rights Act (Discrimination) –**
**A.A. and C.P. against Heuring**

336.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

337.    Plaintiffs A.A. and C.P. have complied with all administrative prerequisites by timely filing Charges of Discrimination based on race with IDHR.

338.    IDHR subsequently issued Notices of Dismissal, and A.A. and C.P. received such Notices of Dismissal by and through their attorneys less than 90 days before the amendment of the instant Complaint to add this Count 20.

339.    The Illinois Human Rights Act ("IHRA") states, in relevant part:

It is a civil rights violation for any person on the basis of unlawful discrimination to: deny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation.

775 ILCS 5/5-102.

340.    At all relevant times, Illinois Central School District 104, CES, and JAMS were and are public places of accommodation under the IHRA, being non-sectarian places of education in the state of Illinois.

341.    At all relevant times, Defendant Heuring was and is a person within the meaning of the IHRA, being an individual.

342.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

343.    Ms. Heuring unlawfully discriminated against A.A. and C.P. in that:

a.    Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

e.    Such actions were taken based on A.A. and C.P.'s race;

      f.      There was no legitimate basis for such differential treatment of A.A. and C.P.; and

      g.      Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of denial of full and equal enjoyment of Illinois Central School District 104's services.

344.    As a direct and proximate result of Heuring's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the denial of full and equal treatment of Central 104's services, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Heuring and for relief in accordance therewith, including but not limited to:

    (a)     Compensatory damages;

    (b)     Prejudgment interest;

    (c)     Attorneys' fees and costs; and

    (d)     All other relief that the Court deems just and proper.

### COUNT 21
### Violation of Illinois Human Rights Act (Retaliation) –
### A.A. and C.P. against Heuring

345.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

346.    Plaintiffs A.A. and C.P. have complied with all administrative prerequisites by timely filing Charges of Discrimination based on race, and the retaliation they faced for opposing the same, with IDHR.

347.    IDHR subsequently issued Notices of Dismissal, and A.A. and C.P. received such Notices of Dismissal by and through their attorneys less than 90 days before the amendment of the instant Complaint to add this Count 21.

348.    The IHRA states, in relevant part:

It is a civil rights violation for a person to retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination.

775 ILCS 5/6-101.

349.    At all relevant times, Defendant Heuring was and is a person within the meaning of the IHRA, being an individual.

350.    At all relevant times, Plaintiffs A.A. and C.P. were and are persons within the meaning of the IHRA, being individuals.

351.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

352.    On or about January 18, 2017, Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

353.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they

reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

354.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

355.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

356.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Heuring retaliated against them by:

    a.    conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;

    b.    conspiring with and recruiting other teachers to wear union shirts and sit in the front rows of school board meeting attended by A.A., C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A. and C.P.; and

    c.    permitting, causing, or contributing numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., and others with whom they associated for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to her racially discriminatory acts.

357.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Heuring and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

### COUNT 22
### Violation of Illinois Human Rights Act (Retaliation) –
### A.A. and C.P. against Weber

358.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

359.    Plaintiffs A.A. and C.P. have complied with all administrative prerequisites by timely filing Charges of Discrimination based on race, and the retaliation they faced for opposing the same, with IDHR.

360.    IDHR subsequently issued Notices of Dismissal, and A.A. and C.P. received such Notices of Dismissal by and through their attorneys less than 90 days before the amendment of the instant Complaint to add this Count 22.

361.    The IHRA states, in relevant part:

It is a civil rights violation for a person to retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination.

775 ILCS 5/6-101.

362.    At all relevant times, Defendant Weber was and is a person within the meaning of the IHRA, being an individual.

363.    At all relevant times, Plaintiffs A.A. and C.P. were and are persons within the meaning of the IHRA, being individuals.

364.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.

365.    On or about January 18, 2017, Defendant Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.

366.    A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.

367.    A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

368.    A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

369.    Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, Weber engaged in a pattern of retaliation and harassment, including without limitation:

   a.    Manipulating black and mixed-race student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to punish A.A. and C.P.; and

    b.   Conspiring with and recruiting students from the high school which A.A. and C.P. would attend after graduating from JAMS to attend school board meetings for the purpose of intimidating A.A. and C.P.;

    c.   Conspiring with and recruiting other teachers to wear union shirts and sit in the front rows of school board meeting attended by A.A., C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A. and C.P.;

    d.   Refusing to properly educate A.A., speak to A.A., look at A.A., and manipulating A.A.'s grades in retaliation for A.A. and C.P's complaints with respect to the incident of January 18, 2017; and

    e.   Taking other discriminatory and retaliatory acts against A.A., C.P., and others with whom they associated for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts and retaliation they experienced.

370.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Weber and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

## COUNT 23
### Violation of Illinois Human Rights Act (Discrimination) – A.A. and C.P. against the Board

371.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

372.    Plaintiffs A.A. and C.P. have complied with all administrative prerequisites by timely filing Charges of Discrimination based on race with IDHR.

373.    IDHR subsequently issued Notices of Dismissal, and A.A. and C.P. received such Notices of Dismissal by and through their attorneys less than 90 days before the amendment of the instant Complaint to add this Count 23.

374.    The Illinois Human Rights Act ("IHRA") states, in relevant part:

It is a civil rights violation for any person on the basis of unlawful discrimination to: deny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation.

775 ILCS 5/5-102.

375.    At all relevant times, Illinois Central School District 104, CES, and JAMS were and are public places of accommodation under the IHRA, being non-sectarian places of education in the state of Illinois.

376.    At all relevant times, the Board was and is a person within the meaning of the IHRA, being an organization, instrumentality, political subdivision, or unit of local government of the State of Illinois

377.    At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a

significant African American population and has a significant African American student population.

378.    A representative, agent, or employee of the Board, and Illinois Central School District 104 itself, discriminated against A.A. and C.P. in that:

     a.    Heuring, a representative, agent or employee of Illinois Central School District 104, intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" multiple times in a classroom in front of their peers;

     b.    Heuring did not refer to A.A. and C.P.'s white or non-African American peers as slaves;

     c.    Heuring was a person with authority and control over A.A., C.P., and their peers, being the students' literature teacher and student council sponsor;

     d.    Heuring conducted such activities in the course of her authorized and/or assigned duties;

     e.    Such actions were taken based on A.A. and C.P.'s race;

     f.    There was no legitimate basis for such differential treatment of A.A. and C.P.; and

     g.    Such actions were severe or pervasive enough to effectively deprive A.A. and C.P. of denial of full and equal enjoyment of Illinois Central School District 104's services.

379.    As The Board invested an official or officials who had actual knowledge of such actions with the duty to supervise Heuring and the power to take action that would end such abuse, but such official or officials failed to do so, or failed to do so in a timely manner.

380.    Illinois Central School District 104 and the Board were deliberately indifferent in responding to such actions, in that school administration was aware of such actions at least on the day after their occurrence, but the Board did not reprimand Heuring until almost one month after the occurrence, after A.A. and C.P.'s parents complained of the events on several occasions,

and the reprimand imposed did not prevent further retaliation against A.A. and C.P., as well as others, for their complaints.

381.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Illinois Central School District 104 Board of Education and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

**COUNT 24**
**Violation of Illinois Human Rights Act (Retaliation) –**
**A.A. and C.P. against the Board**

382.    Plaintiffs A.A. and C.P., by and through their parents and next friends, repeat and reallege paragraphs 1 to 110 as if set forth fully herein.

383.    Plaintiffs A.A. and C.P. have complied with all administrative prerequisites by timely filing Charges of Discrimination based on race, and the retaliation they faced for opposing the same, with IDHR.

384.    IDHR subsequently issued Notices of Dismissal, and A.A. and C.P. received such Notices of Dismissal by and through their attorneys less than 90 days before the amendment of the instant Complaint to add this Count 24.

385.  <u>The IHRA states, in relevant part:</u>

<u>It is a civil rights violation for a person to retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination.</u>

<u>775 ILCS 5/6-101.</u>

386.  <u>At all relevant times, the Board was and is a person within the meaning of the IHRA, being an organization, instrumentality, political subdivision, or unit of local government of the State of Illinois</u>

387.  <u>At all relevant times, Plaintiffs A.A. and C.P. were and are persons within the meaning of the IHRA, being individuals.</u>

388.  <u>At all times relevant herein, the Board permitted, promoted, and/or encouraged an atmosphere and environment of racial hostility by, among other things, failing to employ a single African American teacher at either of its two schools or to otherwise promote racial diversity, despite the fact that Illinois Central School District 104 is located in a community with a significant African American population and has a significant African American student population.</u>

389.  <u>On or about January 18, 2017, Heuring intentionally referred to A.A. and C.P. as "slaves" and/or "Slave Number One" and/or "Slave Number Four" in a classroom in front of A.A. and C.P.'s peers.</u>

390.  <u>A.A. and C.P., individually and by and through their respective parents on their behalf, voiced concerns to Illinois Central School District 104 and the Board regarding what they reasonably and in good faith believed to be discriminatory and unfair treatment which A.A. and C.P. had experienced on or about January 18, 2017.</u>

391.   A.A. and C.P. further participated in an investigation regarding their complaints with respect to the January 18, 2017 Slave Incident.

392.   A.A. and C.P.'s complaints and participation in an investigation with respect thereto constituted protected activities.

393.   Following A.A. and C.P.'s complaints and participation in an investigation with respect thereto, the Board, by and through its representatives, agents, and/or employees, engaged in a pattern of retaliation and harassment against A.A. and C.P., including without limitation:

a.   seeking to intimidate C.P., a minor child, during the investigation of his complaint of discrimination regarding the events of January 18, 2017;

b.   manipulating the entry of black student athletes' grades for purposes of preventing such students from playing in state championship basketball games in order to retaliate against, intimidate and punish A.A. and C.P.;

c.   conspiring with and recruiting students of the high school which A.A. and C.P. would attend after graduating from JAMS to attend a school board meeting for the purpose of retaliating against and intimidating A.A. and C.P.;

d.   conspiring with and recruiting teachers to wear union shirts and sit in the front rows of school board meetings attended by A.A.,C.P. and/or their respective parents for the purpose of retaliating against and intimidating A.A., C.P., and those with whom they associated;

e.   sending a letter to the employer of C.P.'s mother, Krista, suggesting or stating that Krista did not get along with teachers and/or staff at JAMS and/or otherwise portraying Krista as a substandard worker.

f.   assigning a teacher who refused to properly educate A.A., speak to A.A., look at A.A., and who manipulated A.A.'s grades in retaliation for A.A. and C.P.'s complaints with respect to the January 18, 2017 Slave Incident;

g.   terminating the only African-American coaches employed by the school, including C.P.'s father and two other parents who

complained about the unfair treatment A.A. and C.P. at JAMS, in order to retaliate against, intimidate and punish A.A. and C.P.;

h.    directing and/or causing the demotion of C.P.'s mother from her position as cashier in the JAMS cafeteria, and the forcible removal of C.P.'s mother from the JAMS premises, in order to retaliate against, intimidate, and punish A.A. and C.P.; and

i.    permitting, causing, or contributing to numerous other acts of discriminatory and retaliatory conduct against A.A., C.P., their respective parents and others with whom they associated, for purposes of intimidating, punishing, and retaliating against A.A. and C.P. for voicing opposition to the racially discriminatory acts of Illinois Central School District 104, the Board, its representatives, agents, and/or employees.

394.    As a direct and proximate result of Defendant's unlawful conduct, A.A. and C.P. have suffered, and will continue to suffer, from the deprivation of access to educational benefits, severe humiliation, embarrassment, degradation, mental anguish, and emotional and physical distress.

WHEREFORE, Plaintiffs A.A. and C.P., by and through their parents and next friends, pray for Judgment against Defendant Heuring and for relief in accordance therewith, including but not limited to:

(a)    Compensatory damages;

(b)    Prejudgment interest;

(c)    Attorneys' fees and costs; and

(d)    All other relief that the Court deems just and proper.

Respectfully Submitted,

MATHIS, MARIFIAN & RICHTER, LTD.


By   */s/Mark S. Schuver*
     Mark S. Schuver, #06197656
     Natalie T. Lorenz, #06309572
     23 Public Square, Suite 300
     P.O. Box 307
     Belleville, IL 62220
     Phone:  (618) 234-9800
     Fax:  (618) 234-9786
     mschuver@mmrltd.com
     nlorenz@mmrltd.com

     Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE


     I hereby certify that, on June 12, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Illinois by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


     */s/Mark S. Schuver*